Susan J. Gradman (IL ARDC No. 6225060)
David S. Slovick (IL ARDC No. 6257290)
U.S. Commodity Futures Trading Commission
525 W. Monroe St., Suite 1100
Chicago, IL 60661
(312) 596-0523 (Gradman direct dial)
(312) 596-0689 (Slovick direct dial)
(312) 596-0714 (facsimile)
sgradman@cftc.gov
dslovick@cftc.gov

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **U.S. Commodity Futures Trading Commission,** ) | |
| ) | |
| **Plaintiff,** ) | Case No. |
| ) | |
| **v.** ) | |
| ) | **COMPLAINT** |
| **Anthony Eugene Linton d/b/a** ) | |
| **The Private Trading Pool,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

### I.  SUMMARY

1.      From at least October 2007 to the present (the "relevant time"), Anthony

Eugene Linton, also known as Gene Linton ("Linton" or "Defendant"), individually and

1

doing business as The Private Trading Pool ("PTP"), solicited and accepted at least $650,000 from at least 19 individuals for the purported purpose of trading on their behalf off-exchange foreign currency contracts ("forex") in a PTP pooled account.

2.     Linton misrepresented to prospective and existing PTP participants, both orally and in writing, that they would receive a "100% annual return" on their PTP investments and claimed that the software trading system Linton developed and tested allowed PTP to "profit every time" from his forex trades.   Linton further misrepresented that (i) there were no risks whatsoever associated with trading forex through PTP, (ii) participant funds were accessible to participants "within 24 hours" of a requested redemption, and (iii) participants could receive their "profits" by check monthly.

3.     Linton misappropriated the majority of the funds he solicited from participants by using it for purposes other than forex trading, including (i) buying and selling items on eBay (an online auction site), (ii) paying personal expenses, including mortgage, car, and credit card payments, and (iii) paying purported profits to earlier PTP participants in the manner of a Ponzi scheme.   The limited forex trading Linton did engage in with participant funds resulted in consistent net losses and, in the aggregate, Linton lost over 91% of the funds he traded.

4.     Later, when Linton was unable to pay participants their promised monthly "returns," he attempted to conceal his fraud by misrepresenting to participants that he was prevented from returning their funds due to (i) alleged "new restrictions" imposed by the

United States Congress ("Congress") and the National Futures Association ("NFA"), (ii) prohibitions contained in a "Permanent Injunction" issued in his divorce case, and (iii) other purported impediments.

5.      By making false statements to participants regarding PTP's forex trading profits and losses and the use of participant funds, and by misappropriating participant funds, Linton cheated and defrauded, or attempted to cheat and defraud, and willfully deceived, or attempted to deceive, his retail forex customers in violation of the Commodity Exchange Act (the "Act" or the "CEA"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008), and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1 *et. seq.*, specifically Sections 4b(a)(2)(A) and (C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C).[1]

---

[1]   The June 2008 legislation reauthorizing the Commodity Futures Trading Commission revised Section 4b of the Act, among other things.   *See* Section 1302 of the CRA. The objective of the revision was to "clarify that the CEA gives the Commission the authority to bring fraud actions in off-exchange 'principal-to-principal' futures transactions."   H.R. REP. NO. 110-627, at 981 (2008) (Conf. Rep.).   While the CRA did not change the Act's prohibition on misconduct such as that at issue here, it reorganized Section 4b so that similar misconduct occurring on or after June 18, 2008 would be in violation of Sections

3

6.     Plaintiff Commodity Futures Trading Commission (the "CFTC" or the "Commission") has jurisdiction over Linton's unlawful acts and practices that occurred on or after June 18, 2008, and brings this action pursuant to Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, to enjoin such acts and practices and to compel Linton's compliance with the Act.   In addition, the CFTC seeks restitution, disgorgement, rescission, civil monetary penalties, and such other equitable relief as this Court may deem necessary or appropriate.

7.     Unless restrained and enjoined by this Court, Defendant is likely to engage in the acts and practices alleged in this Complaint, or in similar acts and practices, as described more fully below.

## II.   JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(a), which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

4b(a)(2)(A) and (C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C).

9. The CFTC has jurisdiction over the forex solicitations and transactions at issue in this case pursuant to Section 2(c)(2)(C)(i)-(iii) of the Act, as amended, to be codified at 7 U.S.C. § 2(c)(2)(C)(i)-(iii), for conduct that occurred after June 18, 2008, the effective date of the CRA.   The Commission has jurisdiction over off-exchange foreign currency transactions, of the type offered by Defendant, pursuant to the CRA for conduct occurring on or after June 18, 2008.   As a result, Defendant's foreign currency transactions and his conduct that occurred on or after June 18, 2008 are subject to the Commission's jurisdiction.

10. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(e), because Defendant resides in this District and the acts and practices in violation of the Act occurred within this District.

## III.   THE PARTIES

11. Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, as amended, to be codified at 7 U.S.C. §§ 1 *et seq.,* and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2010).

12. Defendant **Anthony Eugene Linton d/b/a The Private Trading Pool** currently resides in Tucson, Arizona, where he operates PTP from his residence.   He has never been registered with the Commission in any capacity.

# IV.   FACTS OF DEFENDANT'S FRAUD

**A.    Solicitation Fraud**

13.    During the relevant time, Linton solicited his friends and acquaintances to invest with PTP, which he represented was a pool he established and managed for the purpose of trading off-exchange forex, that profited "just from the movement in value of the U.S. Dollar" against other foreign currencies.   Linton represented that he pooled the collective resources of PTP participants to trade a larger amount of funds simultaneously every day, thereby making greater profits every day and allowing participants to make money at a proportionate percentage relative to their deposits.

14.    Linton claimed that participation interests were offered only to family members and friends.   However, to some pool participants, Linton represented that PTP "had 160 plus" participants.

15.    Linton typically solicited prospective participants in face-to-face meetings, but he also drafted, signed, and mailed at least six current and prospective participants offering memoranda and letters that described in detail the purported benefits of investing with PTP.   According to Linton, these benefits included riskless and guaranteed profits, and the participants' unfettered access to their principal, which Linton claimed was amply covered by his own assets.

16. In one memorandum, entitled "The Private Trading Pool" (the "PTP Memorandum"), which Linton authored and sent to at least five participants, he made the following misrepresentations:

a. PTP will earn an "8.33% per month average" return, or "100% per year," allowing participants to "doubl[e] your money every year."

b. The strategy of trading the U.S. Dollar against other foreign currencies at precise times of the day and during "News Breaks" was profitable because Linton: had access to future news releases a week before they are actually released to the public; knew what news would be announced and the exact time it would be announced to the public; and, based on such news, could "be there in [his] currency Buys and Sells the instant the future happens, every time," and "profit every time."

c. Linton traded a million dollars of forex every day.

d. There are no risks whatsoever associated with investing in PTP.

e. Participants' money is "safe" and "easily . . . covered" by Linton's own assets.

f. Participants' money is available to them within 24 hours of a requested redemption.

g. PTP and the participants would structure the investment as a "tax free gift plan" in which participation interests would be considered to be "gifts" to

7

PTP and returns from PTP would be "gifts" back to participants, with the result that the transactions would not have to be disclosed to the Internal Revenue Service (the "IRS") and would be considered "tax free" by the IRS.

17. Linton made the same or substantially similar oral misrepresentations of material fact as those included in the PTP Memorandum to participants and prospective participants during the relevant time.

18. In addition to the foregoing misrepresentations included in the PTP Memorandum, Linton misrepresented that his own funds were in the "same place" as participant funds and safely held in his "own multi-million dollar asset balanced Forex Broker fund, backed up by a safe asset portfolio."

19. Linton knew that his oral statements and those contained in the PTP Memorandum were false and misleading or recklessly disregarded the truth at the time he made them.

20. Instead of investing participants' funds in forex, as Linton represented, he used the majority of those funds to buy and sell items on eBay, for personal expenses, and to pay purported forex trading profits to existing participants in the manner of a Ponzi scheme. Linton also converted participant funds into cash and transferred them to a safe in his home. Linton did not disclose to PTP participants that he would use their funds for these purposes or any other purpose other than trading forex.

21.     Linton knew that his statements concerning the tax treatment of investments with PTP were false and misleading, or recklessly disregarded the truth of the statements, at the time he made them.

**B.      Linton Misrepresented to Participants that the Source of the Funds PTP Returned Was Trading Profits**

22.     In both the PTP Memorandum and during face-to-face conversations, Linton told PTP participants that they could receive their "earnings" from PTP's forex trading in a "monthly check" or, alternatively, reinvest such earnings with PTP.

23.     Participants who chose to withdraw their "earnings" began to receive monthly checks from Linton shortly after their initial investment and continued to receive them until early 2009, when Linton suddenly stopped making such payments.

24.     Most of the checks Linton distributed to participants were drawn on Wells Fargo bank accounts maintained in his wife's name and were funded by a combination of cash advances on his wife's credit cards, cash flow from Linton's transactions buying and selling items on eBay, and funds received from other pool participants, which Linton redistributed in the manner of a Ponzi scheme.

25.     The amounts of the monthly checks varied depending on the amount of money each participant had invested with PTP.

26.     Linton falsely represented to participants, both orally and in writing, that the checks were profits earned from his forex trading and averaged a monthly return of 8.33%.

27.     Linton's misrepresentations of material fact caused at least five pool participants to make additional investments in PTP.

28.     In reality, Linton used no more than $36,000 of the $650,000 he solicited from participants to trade forex and lost virtually all of the $36,000 in such trading.

29.     At least eight participants have asked Linton to return their investments in PTP, many on multiple occasions spanning several months, but Linton has failed to honor their requests even though participants were told they would receive their funds "within 24 hours" of a requested redemption.

**C.      Linton Concealed From and Misrepresented to Participants the Reasons Why PTP Could Not Return Participant Funds**

30.     In early 2009, Linton stopped sending monthly checks from PTP to participants and stopped honoring requests from PTP participants to return their principal.

31.     Linton gave participants various false explanations for why he could not continue to pay monthly "profits" or return their principal as promised, including, but not limited to, the following:

a.      In May or June of 2009, Linton sent a letter to participants in which he claimed, "[e]ffective May 15, 2009 the NFA implemented new trading rules prohibiting 'hedging'. . . . [H]edging is no longer permitted in the United States."   As a result of these "new trading rules," Linton claimed, "gains made during last month were lost back into the market . . . ."

b. In June 2009, Linton told at least one participant that he did not have access to the participant's funds because of "new restrictions" imposed on "hedge funds" by the "new administration."

c. In a letter Linton authored and mailed to participants in November or December 2009, Linton again attributed "losses" in PTP to "different trading rules" implemented by "Congress" that Linton claimed prohibited "hedging and other types of safe trade setups . . . ."

d. In the same letter, Linton claimed that a NFA "FIFO Rule" that became effective in August 2009 caused losses in PTP and contended that "any trade placed has to be closed before another trade can be placed on the currency."

32. Each of the representations made by Linton as set forth above was false, and he knew that they were false and misleading, or recklessly disregarded the truth, at the time he made them. In fact, no such "restrictions" or changes in the law occurred during the relevant period that prevented Linton from trading forex or paying participants their monthly "profits," nor did the NFA implement any new rules affecting Linton's forex trading or his ability to return participants' principal. Linton never used the vast majority of the funds he solicited from participants to trade forex, and his failure to pay monthly "profits" was due instead to the fact that he had misappropriated nearly all of the participants' funds.

33. Commencing in November 2009, Linton also falsely blamed his failure to return participant funds on his pending divorce from Susan Linton. For example:

a. Linton told at least one participant that he "couldn't trade" and "couldn't touch the money" because "everything was tied up in [his] divorce," which became final in December 2009.

b. Linton told another participant in or about December 2009 that Linton could not return the participant's investment because Linton's assets were "locked up in the divorce."

c. In a letter Linton authored and sent to PTP participants in early 2010, he reiterated these claims, stating that he was prevented from "trading" or "transfer[ring] . . . funds" due to a "Preliminary Injunction" purportedly issued in his divorce case, and that "gains and trading at all were halted entirely during the settlement of the divorce . . . ."

34. Each of these representations made by Linton with regard to the effect of his divorce on the return of the participant funds was false, and he knew that they were false and misleading, or recklessly disregarded the truth, at the time he made them. In fact, no preliminary injunction or other order was entered in Linton's divorce case, *Susan D. Linton v. Anthony Gene Linton*, Case No. D20094669 (Super. Ct. Az. for Pima Co.), that limited his trading activities or affected the disposition of participants' funds.

35.     In April 2010, after Linton learned that the CFTC was investigating him, he told at least one participant that he had "talked to four accountants and a FBI agent," all of whom opined, according to Linton, that PTP was "okay."   This statement was also false, and Linton knew it was false at the time he made it.

**D.     Linton Misappropriated Customer Funds**

36.     During the relevant time, Linton solicited and accepted at least $650,000 from 19 pool participants, but used no more than $36,000 of that amount to trade forex. Specifically, during the relevant time, at which time Linton was unemployed, he spent $67,722 on personal mortgage payments, $339,863 on car and credit card payments, and $199,573 to pay earlier PTP participants their purported "profits," most or all of which was done with funds received from more recent participants in the manner of a Ponzi scheme.

37.     For example, on March 24, 2009, Linton deposited $18,000 he had solicited from a PTP participant for the purpose of trading forex into Susan Linton's Wells Fargo checking account, which Linton controlled.   Over the next two weeks, between March 24 and April 6, 2009, Linton paid $13,699.66 of this money to 15 participants who had previously invested in PTP and $3,729.57 to the bank that held the mortgage on Linton's house, for a total of $17,429.23 of the $18,000 deposited.

38.     Additionally, Linton used some of the funds from participants to buy and sell items on eBay and also converted large sums of participant funds into cash, which he stashed in a safe in his home.    For example, on March 9, 2009, Linton deposited $96,000

13

that he had solicited from a PTP participant for the purpose of trading forex into the Wells Fargo account maintained in Susan Linton's name.   At the time of the deposit, the Wells Fargo account had a balance of $1,406.73.   The next day, Susan Linton withdrew $66,000 in cash from the account and transferred an additional $18,000 to a second Wells Fargo account in her name, which Linton also controlled.   Two days later, on March 12, 2009, a portion of the $18,000 was used to pay Linton's mortgage.   None of the initial $96,000 was ever used to trade forex.

39.     Between December 2006 and April 2010, Linton deposited $76,000 of commingled personal and participant funds into a forex account maintained in Susan Linton's name at MB Trading Futures, Inc.   No more than $36,000 of these funds was from participants.   Of the $76,000 total deposited, Linton lost approximately $69,315, or 91%, trading forex during the same period.   The MB Trading Futures, Inc. account was the only account in which Linton ever traded forex.

40.     Of the $6,685 remaining in the MB Trading Futures, Inc. account after the losses set forth above, Linton transferred $1,500 to a third Wells Fargo bank account in Susan Linton's name, which he controlled, and issued a $5,000 check to Susan Linton, which was later deposited into the same bank account, co-mingled with Gene and Susan Linton's personal funds, and then used to pay their personal expenses.

### E.    The Nature of the Transactions

41.    Neither Linton nor the purported counterparties to the forex transactions he conducted were financial institutions, registered brokers or dealers, insurance companies, financial holding companies, investment bank holding companies, or the associated persons of financial institutions, registered brokers or dealers, insurance companies, financial holding companies, or investment bank holding companies.

42.    Some or all of Linton's participants were not "eligible contract participants" as that term is defined in Section 1a(12)(A)(xi) of the Act, as amended, to be codified at 7 U.S.C. § 1a(12)(A)(xi).   An "eligible contract participant," as relevant here, is an individual who has total assets in an amount in excess of (i) $10 million or (ii) $5 million and who enters into the transaction in order to manage risk.

43.    The forex transactions Linton purportedly conducted on behalf of his participants were entered into on a leveraged or margined basis.   Accordingly, Linton was required to provide only a percentage of the value of the forex contracts that he purchased. The forex transactions Linton purportedly conducted neither resulted in the delivery of actual currency within two days nor created an enforceable obligation to deliver actual currency between a seller and a buyer that had the ability to deliver and accept delivery, respectively, in connection with their lines of business.   Rather, these forex contracts purportedly remained open from day to day and ultimately were offset without anyone making or taking delivery of actual currency (or facing an enforceable obligation to do so).

# V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

## <u>COUNT ONE</u>

### Violations of Sections 4b(a)(2)(A) and (C) of the Act:
### Fraud by Misappropriation, Misrepresentation and Deceit

44.     The allegations set forth in paragraphs 1 through 43 are realleged and incorporated herein by reference.

45.     Sections 4b(a)(2)(A) and (C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C), make it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of Section 5a(g), that is made, or is to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market –
> (A) to cheat or defraud or attempt to cheat or defraud the other person; or
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

46.     Pursuant to Section 2(c)(2)(C)(iv) of the Act, as amended, to be codified at 7 U.S.C. § 2(c)(2)(C)(iv), Section 4b of the Act, as amended, to be codified at 7 U.S.C. § 6b, applies to Defendant's foreign currency transactions "as if" they were a contract of sale of a commodity for future delivery.

47.     As set forth above, Defendant cheated and defrauded, or attempted to cheat and defraud, and willfully deceived, or attempted to deceive, his retail forex customers by,

among other things, making material misrepresentations and/or failing to disclose material facts to them, and by misappropriating their funds, in violation of Sections 4b(a)(2)(A) and (C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C).

48.     Each misrepresentation or omission of material fact and instance of misappropriation of customer funds made from June 18, 2008 to the present, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(A) and (C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C).

## VI.   RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c of the Act, as amended, to be codified at 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.     An order finding that Defendant violated Sections 4b(a)(2)(A) and (C) of the Act, as amended, to be codified at 7 U.S.C. § 6b(a)(2)(A) and (C);

B.     Enter an *ex parte* statutory restraining order and an order for preliminary injunction pursuant to Section 6c(a) of the Act, as amended, to be codified at 7 U.S.C. § 13a-1(a), restraining Defendant and all persons or entities insofar as they are acting in the capacity of Defendant's agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with Defendant, who receive actual notice of such order by personal service or otherwise, from directly or

indirectly:

1.     Destroying, mutilating, concealing, altering, or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records, or other property of Defendant, wherever located, including all such records concerning Defendant's business operations;

2.     Refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records, or other property of Defendant, wherever located, including all such records concerning Defendant's business operations; and

3.     Withdrawing, transferring, removing, dissipating, concealing, or disposing of, in any manner, any funds, assets, or other property, wherever situated, including, but not limited to, all funds, personal property, money, or securities held in safes or safety deposit boxes, and all funds on deposit in any financial institution, bank, or savings and loan account, whether domestic or foreign, held by, under the control of, or in the name of Defendant;

C.     Enter orders of preliminary and permanent injunction enjoining Defendant and all persons insofar as they are acting in the capacity of Defendant's agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in

active concert or participation with Defendant, who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1. Engaging in conduct in violation of Sections 4b(a)(2)(A) and (C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C);

2. Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, as amended, to be codified at 7 U.S.C. § 1a(29);

3. Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i) ("forex contracts")), for his own personal account or for any account in which he has a direct or indirect interest;

4. Having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on his behalf;

5. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

6. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

7. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010); and

8. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2010)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010);

D. Enter an order directing that Defendant make an accounting to the Court of all of (i) Defendant's assets and liabilities, together with all funds Defendant received from and paid to PTP participants or any other persons in connection with forex transactions or purported forex transactions, including the names, mailing addresses, email addresses, and telephone numbers of any such persons from whom Defendant received such funds from October 1, 2007 to the date of such accounting, and (ii) all disbursements for any purpose whatsoever of funds received from PTP participants and other persons, including salaries, commissions, fees, loans, and other disbursements of money and property of any kind,

from October 1, 2007 to and including the date of such accounting;

E.     Enter an order requiring Defendant immediately to identify and provide an accounting of all assets and property that he currently maintains outside the United States, including, but not limited to, all funds on deposit in any financial institution, futures commission merchant, bank, or savings and loan accounts held by, under the control of, or in the name of Anthony Linton, Anthony Gene Linton, Anthony Eugene Linton, Eugene Linton, Gene Linton, Susan Linton, or The Private Trading Pool, or in which any such person or entity has a beneficial interest of any kind, whether jointly or otherwise, and requiring Defendant to repatriate all funds held in such accounts by paying them to the Clerk of the Court, or as otherwise ordered by the Court, for further disposition in this case;

F.     Enter an order requiring Defendant to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act as described herein, including pre-judgment interest;

G.     Enter an order directing Defendant and any of his successors to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between him and any of the participants whose funds were received by Defendant as a result of the acts and practices that constitute violations of the Act, as described herein;

H.      Enter an order requiring Defendant to make restitution by making whole each and every pool participant or other person whose funds were received or utilized by him in violation of the provisions of the Act as described herein, including pre-judgment interest;

I.      Enter an order requiring Defendant to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of $130,000 for each violation prior to October 22, 2008, and $140,000 for each violation on or after October 22, 2008, or triple the monetary gain to Defendant for each violation of the Act;

J.      Enter an order requiring Defendant to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (1994); and

K.      Enter an Order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.


Dated:   January 11, 2011

                                          Respectfully Submitted,


                                          /s/ David S. Slovick
                                          David S. Slovick
                                          (Illinois ARDC No. 6257290)
                                          Senior Trial Attorney
                                          *dslovick@cftc.gov*

/s/ Susan J. Gradman
Susan J. Gradman
(Illinois ARDC No. 6225060)
Senior Trial Attorney
*sgradman@cftc.gov*


/s/ Scott R. Williamson
Scott R. Williamson
(Illinois ARDC No. 06191293)
Deputy Regional Counsel
*swilliamson@cftc.gov*


/s/ Rosemary Hollinger
Rosemary Hollinger
(Illinois ARDC No. 3123647)
Regional Counsel and Associate Director
*rhollinger@cftc.gov*

COMMODITY FUTURES TRADING
COMMISSION
525 W. Monroe St., Suite 1100
Chicago, IL 60661
(312) 596-0523 (Gradman direct dial)
(312) 596-0689 (Slovick direct dial)
(312) 596-0520 (Hollinger direct dial)
(312) 596-0560 (Williamson direct dial)
(312) 596-0714 (facsimile)


Of Counsel:

Janet K. Martin, Esq.
Assistant United States Attorney
United States Attorney's Office
District of Arizona (Tucson Division)
Evo A. DeConcini Federal Courthouse

405 West Congress, Suite 4800
Tucson, AZ   85701
(520) 620-7493 (direct dial)
(520) 620-7149 (facsimile)
*janet.martin@usdov.gov*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28