**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| **U.S. Commodity Futures Trading Commission,** )<br>)<br>)<br>) | **No. 4:11-cv-021-TUC-FRZ** |
| **Plaintiff,** )<br>) | |
| **v.** )<br>) | **ORDER** |
| **Anthony Eugene Linton d/b/a The Private Trading Pool,** )<br>) | |
| **Defendant.** )<br>) | |

**ORDER OF DEFAULT JUDGMENT**

**I.   INTRODUCTION**

On January 11, 2011, the U.S. Commodity Futures Trading Commission

("Commission") filed a Complaint against Defendant Anthony Eugene Linton ("Linton" or

"Defendant") alleging violations of Sections 4b(a)(2)(A) and (C) of the Commodity

Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(2)(A) and (C), as amended by the Food,

1

Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC

Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18,

2008), and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,

Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of

2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1

*et. seq.*, arising from Linton's solicitation of customers to trade forex contracts and

misappropriation of customer funds.

Defendant did not plead or otherwise defend against the Complaint within the time

permitted by the Federal Rules of Civil Procedure, and the Commission moved for an order

of default judgment granting the Commission's request for a permanent injunction and

other ancillary relief.

This Court has reviewed the Commission's Complaint; the Commission's Motion

for Default Judgment and Memorandum in Support of its Motion for Default Judgment; the

Supplementary Declaration of Commission Investigator Melissa Glasbrenner; and the

Commission's previously filed Brief in Support of its Motions for Injunctive and Other

Equitable Relief and Appendix of Declarations and Exhibits in Support of Plaintiff's

Motion for Statutory Restraining Order and Preliminary Injunction.   Being fully advised

in the premises of this matter,

**THE COURT FINDS:**

1.      This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

2.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendant is found in, inhabits, or transacts business in this District, and the acts and practices conducted in violation of the Act occurred, are occurring, or are about to occur within this District, among other places.

3.      On January 19, 2011, the Commission served Linton with (1) the Complaint and Summons in this case; (2) the Commission's Motion for Preliminary Injunction and Memorandum in Support of Motions for Injunctive and Other Equitable Relief; and (3) a copy of the *Ex Parte* Statutory Restraining Order against Linton entered January 13, 2011. On February 8, 2011, the Commission filed a Notice of Service of these documents pursuant to Rule 5.2 of the Rules of Practice of the U.S. District Court for the District of Arizona, which included a copy of the process server's Proof of Service of the Complaint and Summons on Linton.

4.      Pursuant to Federal Rule of Civil Procedure 12(a)(1), Linton's response to the Commission's Complaint was due within 21 days after he was served with the

3

Summons and Complaint; thus, on or before February 9, 2011.   Linton failed to file an answer or otherwise respond to the Commission's Complaint, or defend against the Commission's action in any other manner, by that date.   Nor did he seek an extension of time to answer or respond to the Complaint.   On May 6, 2011, the Commission filed an Application for Entry of Default against Linton, and the Clerk of Court for the District of Arizona entered default against Linton on May 10, 2011.   The Commission served Linton with a copy of the Clerk's default on May 12, 2011.

5.   The Commission provided Linton adequate notice of its application for this order.   Linton is not an infant or an incompetent.   The Commission's application is not barred by the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. §§ 501 *et seq.*, because Linton is not in the military service of the United States.

6.   The allegations of the complaint are well-pleaded and hereby taken as true.

**A.   Parties**

7.   Plaintiff Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.*

8.   Defendant Anthony Eugene Linton d/b/a The Private Trading Pool lives in Tucson, Arizona.   He has never been registered with the Commission in any capacity.

**B.      Solicitation Fraud**

9.      From at least October 2007 through January 2011, Linton solicited his friends and acquaintances in Tucson, Arizona to invest with him and The Private Trading Pool ("PTP"), which Linton represented was a pool he established and managed for the purpose of trading off-exchange forex on behalf of his family and friends.   Many of Linton's solicitations were made during face-to-face meetings, but he also drafted, signed, and mailed current and prospective participants offering memoranda and letters that described in detail the purported benefits of investing with PTP, including riskless and essentially guaranteed profits, and the participants' unfettered access to their principal.

10.      In one memorandum, entitled "The Private Trading Pool" (the "PTP Memorandum"), Linton represented that pool participants would make a "8.33% per month average" return, or "100% annual return," on their investment and stated, for example, that participants would "make $1,000 on $1,000 every year.   Doubling [their] money every year."   Linton further claimed in the PTP Memorandum that he was able to achieve these outsized returns because he knew in advance "what News [would] be announced, and at the exact time it [would] be announced to the public over Reuters and AP News Wires, CNN, ABC, CBS, NBC, etc."   With the benefit of this information, in conjunction "with the automatic trade placement tools [he] created and developed," Linton claimed he could "be there in [his] currency Buys and Sells the instant the future happens, every time," and "profit every time."

5

11.    In the PTP Memorandum, Linton further represented to prospective participants that their investments in PTP were safe and liquid.   In a section entitled "Pool Safety," Linton stated, "at any time, your investment funds are available to you, in whole or in part.   All it takes is an email to me, or a phone call, and within 24 hours, a check for any amount currently in your account will be sent to you . . . .   When you need it, in whole or in part, you can get it.   A check is issued within 24 hours."   Similarly, in a section of the PTP Memorandum entitled, "So, what are the risks of this?" Linton claimed that there were no risks whatsoever involved in depositing funds with PTP.

12.    Linton sought to reinforce his claims about the safety of participant funds by making assurances in both the written materials he distributed to participants and in his conversations with them, including that he could earn 100% annually, or 8.33% monthly, trading forex.   The PTP Memorandum also sought to induce participants to invest by misrepresenting that investments in PTP, including profits, were "tax free" and did "not have to be claimed on any normal, or special, tax forms" because "all money changing hands are [sic] considered as 'gifts' under IRS Tax Law."

13.    Linton's promises of making annual returns of "100%," the complete absence of risk, and participants' access to their principal were false.   Between December 2006 and April 2010, Linton and PTP used only $76,000, comprised of commingled personal and participant funds, to trade forex, and suffered net losses of approximately $69,315 of those funds, or more than 91% of the total investment.   Further, Linton did not

6

use the vast majority of the funds solicited from prospective participants to trade forex, but instead used participant funds to buy items on eBay and pay personal debts, among other expenditures, and to accumulate cash in a safe at his home.

14.     Linton made many of the foregoing misrepresentations to participants orally as well, including the misrepresentations concerning (i) the use of participants' funds, (ii) guaranteed, tax-free profits, and (iii) the riskless nature of PTP.   Despite numerous requests, often spanning several months, most PTP participants have been unable to recover their principal investment from Linton, much less have their investment returned within 24 hours of a requested redemption, as Linton promised.

**C.     Distribution of False Profits**

15.     In the PTP Memorandum, Linton promised participants that they could receive their "earnings" from PTP's forex trading in a "monthly check" or, alternatively, reinvest such earnings in PTP.   Those participants who chose to withdraw their "earnings" began to receive monthly checks from Linton shortly after their initial investment, generally in amounts equal to 8.33% of their principal, and, in most cases, continued to receive them until the first or second quarter of 2009, which is when Linton suddenly stopped making such payments.

16.     Most of the checks Linton distributed to participants were drawn on bank accounts maintained in the name of his ex-wife, Susan Linton, or were money orders. Although Linton did not provide participants with account statements or other

documentation reflecting the returns on their investments, he represented both orally and in written memoranda sent to participants that these checks were profits earned from his forex trading, which he further represented averaged "8.33% per month."

17.     Linton's claims about monthly "earnings" on his forex trades and the distribution of monthly "profits" were demonstrably false, a fact Linton later admitted when he told participants that he had been paying their monthly checks from sources other than PTP's "earnings."   Instead of profits from purported forex trading, the monthly checks participants received consisted of a combination of cash advances on credit cards held by Susan Linton, cash flow from Linton's transactions buying and selling items on eBay, and funds received from other pool participants, which Linton redistributed in the manner of a Ponzi scheme.

**D.     False Statements Regarding Failure to Return Participant Funds**

18.     When participants began to complain that they were no longer receiving monthly checks, Linton gave them various false explanations for why he could not continue to pay monthly "profits" or return participants' principal as promised.   For example, in June 2009, Linton told participant Rodney Belknap ("Belknap") that Linton did not have access to Belknap's funds because of "new restrictions" imposed on "hedge funds" by the "new [presidential] administration."   In a letter to participants sent in or about April 2009, Linton further claimed that he had been "unable to trade much" since October 2008, and that, "[f]rom October to March" PTP experienced "Spread losses."

19.     In May or June of 2009, Linton sent another letter to participants, this time claiming that, "[e]ffective May 15, 2009 the [National Futures Association] implemented new trading rules prohibiting 'hedging' . . . .   [H]edging is no longer permitted in the United States."   As a result of these "new trading rules," Linton claimed, "gains made during last month were lost back into the market . . . ."   Contrary to these claims, Linton never used the vast majority of the funds he solicited from participants to trade forex, and his failure to pay monthly "profits" was due instead to the fact that he had misappropriated nearly all of those funds.

20.     Later, in November 2009, Linton began to blame his failure to return participant funds on his pending divorce from Susan Linton, which became final in December 2009.   For example, Linton told Belknap that he could not repay Belknap his investment in PTP because his pending divorce restricted his ability to move assets of PTP. Linton told another participant, Robert Shaun Herrington ("Herrington"), in or about December 2009, that Linton could not return Herrington's investment because Linton's assets were "locked up in the divorce."

21.     In a letter sent to PTP participants in November or December of 2009, Linton reiterated these claims, stating that he was prevented from "trading" or "transfer[ring] . . . funds" due to a "Preliminary Injunction" purportedly issued in his divorce case and that "gains" and "trading were halted entirely during the settlement of the divorce . . . ."

However, no preliminary injunction or other order was entered in Linton's divorce case that limited his trading activities or affected the disposition of participants' funds.

22.     In a letter mailed to participants beginning in November or December 2009, Linton also attributed "losses" in PTP to "different trading rules" implemented by "Congress" that Linton claimed prohibited "hedging and other types of safe trade setups . . . ."   In addition, he blamed losses on a new "rule" purportedly enacted by the National Futures Association in August 2009.   These claims were false.   No such rules or restrictions affecting Linton's trading were enacted between 2008 and 2010, and only a small fraction of the money Linton solicited from participants was ever used to trade forex.

**E.     Misappropriation**

23.     During the relevant time, Linton solicited and accepted $583,695 from 19 pool participants, but used no more than $36,000 of that amount to trade forex. Specifically, Linton spent $67,722 on personal mortgage payments, $339,863 on car and credit card payments, and $199,573 to pay earlier PTP participants their purported "profits," most or all of which consisted of funds received from more recent participants in the manner of a Ponzi scheme.   In addition, Linton used some of the funds from participants to buy and sell items on eBay and converted large sums of participant funds into cash, which he kept in a safe in his home.

24.     Between December 2006 and April 2010, Linton deposited a total of $76,000 of commingled personal and participant funds into a forex trading account in Susan

10

Linton's name at MB Trading Futures, Inc., a futures commission merchant and forex

dealer.   No more than $36,000 of these funds belonged to PTP pool participants.   Of the

$76,000 total deposited, Linton lost $69,315, or 91%, trading forex during the same period.

Linton did not trade PTP pool participant funds in any other account.

## II.   CONCLUSIONS OF LAW

25.     For the reasons set forth above in paragraphs 1 through 24, from at least June

18, 2008, and continuing through January 2011, Linton violated Sections 4b(a)(2)(A) and

(C) of the Act, as amended by the CRA, in or in connection with forex contracts, made or to

be made, for or on behalf of, or with, other persons, by, among other things, soliciting

investments through fraudulent misrepresentations about PTP's past and current trading

performance and the risk of loss, and misappropriating funds received from participants for

the purpose of trading forex.

## III.   PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

26.     Defendant Linton is permanently restrained, enjoined and prohibited from

directly or indirectly:

> cheating, defrauding or willfully deceiving, or attempting to cheat, defraud
> or willfully deceive, other persons in or in connection with any order to
> make, or the making of, any contract of sale of any commodity for future
> delivery, or swap, that is made, or to be made, for or on behalf of, or with,
> any other person, other than on or subject to the rules of a designated contract
> market, in violation of Sections 4b(a)(2)(A) and (C) of the Act as amended

by the CRA and the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 6b(a)(2)(A) and (C).

27.     Defendant Linton is also permanently restrained, enjoined and prohibited

from directly or indirectly:

a)      trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act as amended by the CRA and the Dodd-Frank Act, to be codified at 7 U.S.C. § 1a);

b)      entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2011)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for his own personal accounts or for any account in which he has a direct or indirect interest;

c)      having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on his behalf;

d)      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

e)      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

f)      applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

g)      acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the

Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

28.    In the event that Defendant Linton files a petition in bankruptcy, he shall provide the Commission with prompt notice by Certified Mail of such filing, as required by paragraph 44 of Part V. of this Order.

29.    The injunctive provisions of this Order shall be binding upon Defendant Linton, upon any person or entity under his authority or control who receives actual notice of this Order by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Linton.

## IV.   RESTITUTION, CIVIL MONETARY PENALTY AND DISGORGEMENT

### IT IS HEREBY ORDERED THAT:

**A.    Restitution**

30.    Defendant Linton's violations of the Act warrant the award of significant restitution to the customers he defrauded.   Defendant shall pay restitution in the amount of $384,122 within ten (10) days of the date of entry of this Order ("Restitution Obligation"). Should Defendant not satisfy the Restitution Obligation within ten (10) days of the date of entry of this Order, post judgment interest shall accrue on the Restitution Obligation commencing on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

13

**B.      Appointment of Monitor**

31.      To effect payment of the Restitution Obligation and the distribution of restitution to Defendant's customers, the Court appoints the National Futures Association ("NFA") as Monitor.   The Monitor shall collect restitution payments from Defendant and make distributions as set forth below.   Because the Monitor is acting as an officer of the Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

32.      Defendant shall make any required restitution payments under this Order to the Monitor in the name of the "Private Trading Pool Customers' Restitution Fund" and shall send such restitution payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, under cover of a letter that identifies Defendant Linton d/b/a The Private Trading Pool as the payer, the case name, docket number, and the name of this Court.   Defendant shall simultaneously transmit copies of the cover letter and form of payment to the: (a) Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581; and (b) Chief, Office of Cooperative Enforcement, Division of Enforcement, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

33.     The Monitor shall distribute restitution payments to Defendant's customers in an equitable manner as determined by the Monitor.   The Monitor shall oversee the distribution of funds of the Restitution Obligation and shall have the discretion to determine the manner of distribution of funds in an equitable fashion to Defendant's customers identified by the Commission, or may defer distribution until such time as it deems appropriate.   In the event that the amount of restitution payments made to the Monitor are of a *de minimis* nature, such that the Monitor determines that the administrative costs of making a distribution to Defendant's customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for the civil monetary penalty obligation as set forth below.

34.     Any amount paid to one of Defendant's customers pursuant to this Order shall not limit the ability of that customer to independently prove in a separate action that a greater amount is owed from any person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under federal, state, or common law to assert a claim for recovery against Defendant subject to any offset or credit that Defendant may be entitled to claim under the law governing that customer's claim.

35.     Pursuant to Federal Rule of Civil Procedure 71, each customer identified by the Monitor is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of Defendant's

Restitution Obligation that has not been paid, to ensure compliance with any provision of this Order, and to hold Defendant in contempt for any violations of any provision of this Order.

36.     To the extent that any funds accrue to the U.S. Treasury as a result of Defendant's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in the preceding paragraph.

**C.      Civil Monetary Penalty**

37.     Defendant shall pay a civil monetary penalty of $1,044,366 within ten (10) days of the date of entry of this Order (the "CMP Obligation").   Should Defendant not satisfy his CMP Obligation within ten (10) days of the date of entry of this Order, post-judgment interest shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961(a).

**D.      Disgorgement**

38.     Defendant shall pay disgorgement in the amount of $348,122 within ten (10) days of the date of entry of this Order (the "Disgorgement Obligation").   Should Defendant not pay his Disgorgement Obligation within ten (10) days of the date of entry of this Order, post-judgment interest shall accrue on the Disgorgement Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

16

39.     Defendant shall pay his CMP Obligation and Disgorgement Obligation by electronic funds transfer, or by U.S. Postal money orders, certified checks, bank cashier's checks, or bank money orders, made payable to:

    Commodity Futures Trading Commission
    Division of Enforcement
    Accounts Receivables – AMZ 340
    E-mail Box:  9-AMC-AMZ-AR-CFTC
    DOT/FAA/MMAC
    6500 S. MacArthur Blvd.
    Oklahoma City, Oklahoma 73169
    Telephone: 405-954-6569

40.     If payment is to be made by electronic funds transfer, Defendant shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions.   Defendant shall accompany payment of the penalty with a cover letter that identifies the paying Defendant and the name and docket number of the proceedings.   The Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, and the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address.

17

E.     **Partial Payments**

41.    Any acceptance by the Commission and/or Monitor of partial payment of Defendant's Restitution Obligation, Disgorgement Obligation and/or CMP Obligation shall not be deemed a waiver of the respective requirement to make further payments pursuant to this Order, or a waiver of the Commission's right to compel payment of any remaining balance

## V.   MISCELLANEOUS PROVISIONS

**IT IS HEREBY ORDERED THAT:**

42.    Collateral Agreements:   Defendant Linton shall immediately notify the Commission and Monitor if he makes or has previously made any agreement with any of his customers obligating Linton to make payments outside this Order.   Defendant Linton shall also provide immediate evidence to the Commission and the Monitor of any payments made pursuant to such agreement.   Upon being notified of any such payments by Defendant, and receiving evidence of such payments, the Monitor will have the right, but not the obligation, to reduce and offset the distribution of funds from the Restitution Obligation to those specified customer(s) and to make any other changes in the restitution distribution schedule that the Monitor shall deem appropriate.

43.    Transfer of Assets:   Defendant Linton shall not transfer or cause others to transfer funds or other property to the custody, possession, or control of any other person

for the purpose of concealing such funds from the Court, the Commission, the Monitor or any customer.

44.    <u>Notices</u>:    All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested and shall reference the name and docket number of this action, as follows:

    a.    **Notice to Commission**:

        Regional Counsel
        Division of Enforcement−Central Region
        Commodity Futures Trading Commission
        525 West Monroe Street, Suite 1100
        Chicago, Illinois 60661

    b.    **Notice to the Monitor**:

        Vice President, Compliance
        National Futures Association
        300 South Riverside Plaza, Suite 1800
        Chicago, Illinois 60606; and

    c.    **Notice to Defendant Linton**:

        Anthony Eugene Linton
        c/o Gospel Rescue Mission
        312 W. 28th St.
        Tucson, AZ 85713

45.    <u>Change of Address/Phone</u>:    Until such time as Defendant satisfies his Restitution Obligation, Disgorgement Obligation and CMP Obligation as set forth in this Order, in the event Defendant changes his residential or business telephone number(s)

and/or address(es), he shall provide written notice of the new number(s) and/or address(es) to the Commission within twenty (20) calendar days thereof.

46.   <u>Modification of Order</u>:   Nothing shall serve to amend or modify this Order in any respect whatsoever, unless:   (a) reduced to writing; and (b) approved by order of this Court.

47.   <u>Invalidation</u>:   If any provision of this Order or if the application of any provisions or circumstances is held invalid, the remainder of the Order and the application of the provisions to any other person or circumstance shall not be affected by the holding.

48.   <u>Waiver</u>:   The failure of any party subject to this Order at any time to require performance of any provision of the Order shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Order.   No waiver in one or more instances of the breach of any provision contained in this Order shall be deemed to be or construed as a further or continuing waiver of such breach, or waiver of the breach of any other provision of this Order.

49.   <u>Continuing Jurisdiction of this Court</u>:   This Court shall retain jurisdiction of this case to assure compliance with this Order and for all other purposes related to this action, including any motion by a party to modify, or obtain relief from, the terms of this Order.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Order of Default Judgment.

Dated this 30th day of January, 2012.


_____

Frank R. Zapata
Senior United States District Judge